Johnson Bronze Company v. Commissioner.
Johnson Bronze Co. v. Commissioner
Docket No. 4306-62.
United States Tax Court
T.C. Memo 1965-281; 1965 Tax Ct. Memo LEXIS 47; 24 T.C.M. (CCH) 1542; T.C.M. (RIA) 65281; October 26, 1965
*47 Petitioner corporation formed a subsidiary for the purpose of expanding its business in foreign countries beyond sales activities and subsequently turned the majority of its foreign sales accounts over to the subsidiary. Held, the subsidiary was a viable entity. Held further, the transactions attributed to the subsidiary were correctly attributed. Held further, respondent's allocation to petitioner of 100 percent of the income of the subsidiary was a clear abuse of discretion. Correct allocation determined. Paul G. Rodewald and William Y. Rodewald, Oliver Bldg., Pittsburgh, Pa., for the petitioner. Gerald Backer, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in petitioner's income tax for the taxable years 1959 and 1960 in the amounts of $76,594.97 and $99,118.94, respectively. Prior to trial the parties disposed of certain issues raised by respondent in his deficiency notice by agreeing to various adjustments. The only issue remaining for decision is whether any of the income of a whollyowned subsidiary of petitioner should be included in the taxable income of petitioner pursuant to sections 61 or 482 of the Internal Revenue Code of 1954. *48 [1]
Findings of Fact Some of the facts have been stipulated and the stipulations of facts, together with the exhibits attached thereto, are incorporated herein by reference. Johnson Bronze Company (hereinafter sometimes referred to as petitioner) is a corporation organized under the laws of Pennsylvania in 1901 and has its principal place of business in New Castle, Pennsylvania. It engages in the manufacture and sale of bushings, bearings, and related products and has been under the control of the Flaherty family for 50 years. Johnson Bronze International, Inc., (hereinafter sometimes referred to as International) was organized under the laws of Panama in June 1959 as a subsidiary of petitioner. All of International's stock was acquired for $200,000 and has continuously been held by petitioner. Petitioner maintained manufacturing, sales, credit, research and development, engineering, warehousing, finance and export departments for which it employed about 1,200 persons. Through research and development petitioner has developed technological improvements in the production of its products. Petitioner has acquired *49 five United States patents and three United States registered trademarks. Petitioner sold its manufactured products to original engine manufacturers such as Ford, General Motors, and American Motors corporations for use in new automobile engines, to production engine rebuilders for use in rebuilding engines, and to customers for use in the repair of automotive engines. Petitioner's sales of parts for use in new engines were at prices set by competitive bidding by other manufacturers. Petitioner was willing to sell to the automotive industry for minimal profits, and at times deliberate losses, for two reasons both of which gave petitioner an advantage in obtaining sales of replacement parts. First, petitioner desired the prestige resulting from supplying parts for the current year's models; second, petitioner could thereby obtain the designs and requirements of the industry for the parts which petitioner was supplying. Petitioner's sales price for automotive replacement parts was set by the automobile manufacturers. Petitioner was bound to these prices, irrespective of costs. Petitioner's domestic and Canadian sales were obtained by salesmen and sales agencies (including warehousemen) *50 who maintained an inventory of petitioner's products, made over-the-counter sales, and handled the billing of customers. They received a commission based on their gross sales of petitioner's products. Foreign sales consisted principally of automobile replacement parts. Prior to the incorporation of International, many of petitioner's foreign orders were obtained by manufacturers' representatives with whom petitioner had contracts for exclusive overseas territories. These manufacturers' representatives received commissions that varied from 5 to 10 percent of sales according to the nature of the products sold. The selling price was usually the price quoted in petitioner's price lists less trade discounts. The terms of the sales were f.o.b., New Castle, with insurance fees and freight from New Castle being borne by the customers. In some cases petitioner was advised not to insure the merchandise because the customer had existing insurance covering such shipment. Both before and after the incorporation of International, substantial sales were made to approximately 30 American export firms by petitioner for resale overseas. These sales required handling similar to that required by petitioner's *51 direct foreign sales and were under the supervision of petitioner's export department. These export firms had their own customers and warehouse facilities, handled their own bookkeeping, and bore all risks of collection. The prices charged the export firms were computed on the basis of jobbers' net prices shown in petitioner's price lists, less various trade discounts and commissions which varied in amount according to the nature of the goods sold. By the time of the incorporation of International, petitioner had established an extensive export market and had developed trained personnel familiar with the problems and requirements of handling foreign sales. Moreover, petitioner's products were internationally well known and petitioner enjoyed an excellent reputation. As a result of petitioner's already established export market, and because of the close relationship of bearings and piston rings, in late 1957, the Muskegon Piston Ring Company (hereinafter sometimes referred to as Muskegon) agreed to sell piston rings manufactured by Muskegon to petitioner for distribution and resale in foreign countries. After its incorporation, International also bought piston rings from Muskegon for *52 resale in foreign countries. There were occasions when foreign purchasers would order a part which petitioner did not manufacture or maintain in its inventory. In those situations petitioner would order such part from the Effingham Regrinding Company (hereinafter sometimes referred to as Effingham), or would supply an Effingham product which petitioner had in its inventory because a customer had returned a previous purchase. After its incorporation, International also purchased products from Effingham. By 1959 it had become apparent that petitioner's export sales were on a decrease. As an example, export sales to Brazilian customers fell from $231,000 in 1957 to $36,000 in 1958. This fact was most disturbing to petitioner's officers and directors and they desired to remedy the situation. Petitioner was advised by industrialists in other countries to go into business in those countries (beyond the selling activities it was then conducting). Among the reasons given the officers and directors for more direct involvement in foreign countries was the fact that manufacturers in foreign countries, because of lower overhead and labor costs, were able to compete in foreign markets at prices *53 which United States manufacturers could not profitably meet. Also local prejudice in favor of local products and, in many cases, outright nationalistic policies of foreign governments (such as restrictions on imports), were making it more difficult to export into, and sell in, certain foreign countries. But, in spite of the advice, petitioner had declined to become directly involved in foreign countries. One of the directors of petitioner, J. Preston Flaherty, a substantial shareholder, was strongly opposed to entering the foreign field in any form. Other directors and officers were not completely sold on the idea either. They were concerned about such dangers in foreign countries as expropriation, economic instability and inflation, potential tort or contract liability, foreign taxes, and liabilities arising out of joint or partnership operations, and the unknown dangers which lurk behind involved business transactions. They concluded that there was no effective way to insulate petitioner from such risks or to limit such losses if petitioner entered into business in foreign countries either by itself or in some form of partnership with foreign persons or entities. Even a limited partnership *54 was believed to be unsafe since there was doubt as to how effective the limitations would be under the laws of the foreign countries. Therefore, the officers and directors decided that if petitioner was to go into business in foreign countries it should form a subsidiary in order to limit losses and potential liabilities to the assets in the subsidiary. In 1958, representatives of Sinterosa, a Brazilian limited partnership that manufactured bushings and bearings, approached petitioner with the proposal that petitioner and Sinterosa form a joint partnership which would use petitioner's know-how and experience in manufacturing bushings and bearings in Brazil. Petitioner sent one of its officers to Brazil to investigate this possibility. On the basis of his report, and a letter from Price Waterhouse, Peat & Co., as to the uncertainty of Sinterosa's financial condition, petitioner's directors decided not to accept the proposal and so notified Sinterosa. Shortly thereafter, Walter Biberschik, one of the minority partners in Sinterosa, came to New Castle and persuaded petitioner's directors that in order to retain any part of the Brazilian market, it had better actively participate in manufacturing *55 and sales in Brazil through Sinterosa. Petitioner's directors decided to form International for the purpose of entering into a limited partnership with Sinterosa. It was decided that a Latin-American corporation would have an advantage over a United States corporation because Latin-American courts would be less likely to impose contract or tort liability upon the parent by "piercing the corporate veil." It was also believed that a Latin corporation, having less color of "Yankee Imperialism" than a United States corporation, would be able to operate more effectively in South America. Panama was chosen as the location of International because of the similarities of its corporation laws and those of the United States. Federal and State tax consequences were considered by petitioner's directors in the formation of International but were not the controlling factor in the decision to form International. It was decided that a Western Hemisphere Trade Corporation, in spite of the tax benefits granted by sections 921 and 922, would not serve petitioner's purposes as their business would then be limited to the Western Hemisphere. International was incorporated under the laws of Panama in June *56 1959. Petitioner was issued all of International's stock in exchange for $200,000. International acquired a one-half interest in Sinterosa which changed its name to Johnson Bronze do Brasil Auto Pecas Limitada (hereinafter sometimes referred to as Johnson Bronze do Brazil). Johnson Bronze do Brazil expanded its manufacture and sale of bushings and bearings in Brazil with the aid of some obsolete machinery which petitioner had owned and transferred to International and which International had shipped to Brazil. International also purchased machinery and equipment costing $123,000 in the United States and England and shipped it to Brazil where Johnson Bronze do Brazil put it into operation. Petitioner transferred to International, without any consideration or written instrument, its goodwill, know-how, trade name, trademarks, and similar intangibles for use in foreign countries. In the same manner, petitioner has made similar transfers to Ferraloy, Inc., a domestic subsidiary of petitioner, for use in the United States. International allowed Johnson Bronze do Brazil to use the aforementioned assets and later granted the Nagato Metal Industrial Corporation, a Japanese company in which *57 it had acquired a 15 percent stock interest, the right to use the know-how acquired from petitioner in exchange for a royalty. In connection with its dealings in Japan, it was necessary for International to give to the Japanese appointee the right to affix International's "han" which is a formalized signature binding International formally to any document to which the "han" is affixed. Similarly, in 1960, International granted to the Sintermetal Corporation, an Argentine manufacturer of bushings and bearings, the right to use the intangible assets acquired from petitioner in exchange for a royalty. In 1961 International guaranteed a loan of Sintermetal's and later acquired 35 percent of its stock. Beginning July 1, 1959, International took over most of petitioner's foreign accounts. Canadian sales were excepted because they were handled as domestic sales by petitioner. Petitioner continued sales to domestic firms which in turn exported the goods to their own foreign customers, the identity of which was often unknown to petitioner. When International took over the foreign sales, petitioner turned over to International $35,000 to $40,000 of foreign orders already accepted by petitioner *58 in its own name. In 1958 petitioner had sales in excess of $1,000 to each of 75 customers in foreign countries. In 1960 International had sales in excess of $1,000 to each of 115 customers in foreign countries. Neither International nor petitioner sold to customers of the other. International bought bushings, bearings, and related products from petitioner as needed, piston rings from Muskegon, and connecting rods from Effingham to fill its orders from unrelated customers in foreign countries. Sales of Muskegon and Effingham products represented an insignificant part of International's sales. International adopted its own bylaws and elected its own officers and directors who held meetings, kept minutes, and made the decisions necessary to the running of a corporation. Of International's three officers, only Thomas H. Conner, vice president and treasurer, was also an officer of petitioner, and of its three directors, only Edward M. Flaherty was a director of petitioner. International had no employees, paid no salaries, owned no offices or office equipment, and had no warehouse. Petitioner's employees performed executive and clerical services for International. International reimbursed *59 petitioner monthly on the basis of the estimated time spent by petitioner's employees on International's work. These estimates were from time to time brought up to date. International paid petitioner $100 monthly as rent for space and equipment it used and $10 per month for sundry small supplies it consumed. International paid petitioner 5 percent of the purchase price of the piston rings International bought from Muskegon as compensation for furnishing International with warehouse facilities for the piston rings. International also reimbursed petitioner for salary and travel expenses paid on behalf of one of petitioner's engineers who went to Brazil on behalf of Johnson Bronze do Brazil. All these amounts were reasonable. Except for a period of transition after International's incorporation, during which International stamped "International" on petitioner's forms, International has had its own forms and documents. International maintains bank accounts at the First National City Bank of New York, the Chase Manhattan Bank in New York, two banks in Tokyo, Japan, and one in Buenos Aires, Argentina. International has consistently maintained complete and separate records and books of account. *60 On occasion certain sales were entered incorrectly upon International's books and were reversed upon the discovery of error and entered upon petitioner's books. International has paid commissions on sales to agents or representatives acting on its behalf. International had its own price lists. Prior to International's incorporation, petitioner sold products to the Dubars Company for resale. The Dubars Company owed petitioner a large amount of money and it was decided that the arrangement would be changed to make Dubars a shipping and collection agency for International. Any collections made by Dubars were to be deposited in International's Chase Manhattan account. Some of the sales orders which were accepted and filled by International were originally addressed to petitioner. International and petitioner share the same office building on South Mill Street in New Castle, Pennsylvania. A policy was attempted whereby, as a matter of convenience, petitioner's and International's addresses on South Mill Street were denominated by different numbers, but this was not always adhered to. All sales accepted by International, whether they were originally addressed to petitioner or International, *61 were accepted on a form that made acceptance conditional upon the following terms which were stated on the back of the acceptance form: If the base price by F.A.S. or F.O.B. (plant or port), the total price will equal the sum of the F.A.S. or F.O.B. base price and actual cost of transportation, insurance, forwarding charges and other costs of exportation incurred from F.A.S. or F.O.B. point specified to point of passage of title as stated below. Title, ownership, right of possession, and risk of loss with respect to the goods described herein shall remain with the SELLER until: (a) Discharged overside from overseas vessel or aircraft at port of entry of the country, outside the United States, in which PURCHASER has specified delivery, or (b) If transported other than by overseas vessel or aircraft, until such goods arrive at the country outside the United States, in which PURCHASER has specified delivery. The manner of payment or method of shipment shall not in any way limit or modify the rights of the SELLER as the legal owner of the goods to have control over and right to possession of them during the course of shipment and until title be transferred as aforesaid. All customers *62 to which International was shipping products were advised that the sale was that of International and not petitioner's regardless of whether they had originally sent the order to International or petitioner. International arranged and paid for the shipment of the products it sold by using various freight companies. International carried its own insurance on goods in transit, payable to International or to an agent or shipper as an agent of International. International was reimbursed for its shipping and insurance expenses by the customer. The prices that petitioner charged International for products manufactured by petitioner and sold to International were computed on each item by adding the allocable overhead and a profit factor to petitioner's cost as determined by petitioner. These costs were determined from detailed calculations and were accurate to the best of petitioner's ability. They were reviewed once a year for the purpose of bringing them up to date but there was no allowance for variance once the cost was determined. The allocable portion of overhead was determined by eliminating those items of overhead which would not have been incurred if petitioner had sold its goods *63 exclusively to customers like International for resale in foreign countries. In determining the profit factor, petitioner attempted to figure the historical probability of each line of products as a percentage of manufacturing cost. For example, for products in the automotive stock line, which were about 75 percent of the dollar sales to International, petitioner used 6 percent because it figured its profits for years prior to 1959 to average 6 percent. In the other lines the percentage was set by comparing profitableness of those lines to the automotive stock line. Overall sales of petitioner were used as data for the profit factor computation rather than just the sales to customers that resold in foreign countries. International always paid petitioner for the products it bought from petitioner within 30 days of the sale although it often would not receive payment from its customers for 6 months or longer. Petitioner sold to jobbers, warehousemen, and exporters at prices which were usually higher and only rarely lower than those prices charged to International for the same or similar goods. Petitioner did allow such purchasers trade discounts and commissions which were denied International. *64 Petitioner's and International's financial statements for 1959 contain the following: Johnson Bronze
Johnson Bronze
Company
International, Inc.
Sales: Customer
$17,677,355.96
$281,678.97
Inter-company
218,604.17 *
0
$17,895,960.13
$281,678.97
Less returns and allowances, freight
and discount
456,441.52
8,017.53
NET SALES
$17,439,518.61
$273,661.44
Cost of products sold
13,339,949.97
190,845.70
$ 4,099,568.64
$ 82,815.74
Expenses: Shipping
$ 711,418.20
$ 0
Selling
1,213,409.21
18,310.61
Administrative and general
1,315,803.49
604.58
$ 3,240,630.90
$ 18,915.19
Bad debts
24,676.58
2,000.00
$ 3,265,307.48
$ 20,915.19
$ 834,261.16
$ 61,900.55
Other income: Interest earned
$ 24,710.09
$ 0
Dividends received
5,274.22
0
Recoveries on accounts previously
charged off
6,163.11
0
Miscellaneous
5,243.52
0
$ 41,390.94
$ 0
INCOME BEFORE TAXES
ON INCOME
$ 875,652.10
$ 61,900.55
Taxes on income: Provision for year: Federal
$ 430,000.00
$ 0
State
36,000.00
0
Adjustment of prior years (deduction)
4,457.62
0
$ 461,542.38
$ 0
NET INCOME
$ 414,109.72
$ 61,900.55
Petitioner's and International's financial statements for 1960 contain the following: Johnson Bronze
Johnson Bronze
Company
International, Inc.
Sales: Customer
$15,116,327.27
$601,231.89
Inter-company
318,228.72 *
0
$15,434,555.99
$601,231.89
Less returns and allowances, freight
and discount
406,583.85
21,683.84
NET SALES
$15,027,972.14
$579,548.05
Cost of products sold
11,792,363.10
339,380.41
$ 3,235,609.04
$240,167.64
Expenses: Shipping
$ 937,385.22
$ 0
Selling
947,807.01
73,244.03
Administrative and general
1,263,244.07
6,591.68
$ 3,148,436.30
$ 79,835.71
Bad debts
$ 60,386.84
$ 14,747.40
$ 3,208,823.14
$ 94,583.11
$ 26,785.90
$145,584.53
Other income: Interest earned
$ 26,337.46
$ 0
Dividends received
5,954.75
0
Recoveries on accounts previously
charged off
8,377.14
0
Miscellaneous
12,356.94
0
$ 53,026.29
$ 0
$ 79,812.19
$145,584.53
Other deductions
$ 25,000.00
0
INCOME BEFORE TAXES
ON INCOME
$ 54,812.19
$145,584.53
Taxes on income: Provision for the year: Federal
$ 22,000.00
$ 0
State
1,100.00
0
$ 23,100.00
$ 0
NET INCOME
$ 31,712.19
$145,584.53
Petitioner's *65 and International's balance sheets as of December 31, 1959, contained the following: Johnson Bronze
Johnson Bronze
Company
International, Inc.
CURRENT ASSETS
Cash
$ 600,681.90
$ 54,494.35
Obligations of the United States
Government and Agencies - at cost
(approximate market)
508,537.55
0
Receivables: Trade
$ 1,948,257.71
$199,453.18
Less allowance for losses in collection
20,000.00
2,000.00
$ 1,928,257.71
$197,453.18
Wholly owned subsidiaries
76,728.91
0
$ 2,004,986.62
$197,453.18
Inventories: Finished products
$ 1,842,448.19
$ 35,398.06 *
Work in process
785,135.64
0
Raw materials
1,115,356.59
0
Manufacturing supplies
132,213.33
0
$ 3,875,153.75
$ 35,398.06
Prepaid insurance and other expenses
62,546.00
0
TOTAL CURRENT ASSETS
$ 7,051,905.82
$287,345.59
INVESTMENTS AND OTHER ASSETS
Investments in and advances to wholly
owned subsidiaries
$ 370,000.00
$ 0
Capital stock of other company - at
cost
(quoted market price $182,752.77)
20,000.00
0
Other investment
0
16,000.00
Miscellaneous receivables, advances,
deposits, etc.
69,211.88
0
$ 459,211.88
$ 16,000.00
PROPERTY, PLANT AND EQUIPMENT
- at cost, less allowances for
depreciation and amortization
Land
$ 134,605.45
$ 0
Buildings, machinery and equipment
$ 6,418,263.82
$ 0
Less allowances for depreciation
and amortization
$ 3,078,650.84
0
$ 3,339,612.98
$ 0
Facilities subject to amortization
under
provisions of Revenue Act of 1950: Buildings, machinery and
equipment
$ 545,498.35
$ 0
Less allowance for amortization
545,498.35
0
$ 0
$ 0
$ 3,474,218.43
$ 0
PATENTS - at cost, less amortization
520.08
0
ORGANIZATION EXPENSE - at cost,
less amortization
0
876.00
$10,985,856.21
$304,221.59
CURRENT LIABILITIES
Accounts payable and accrued expenses: Trade accounts
$ 724,239.83
$ 3,179.46
Johnson Bronze Company
0
39,141.58
Salaries, wages, vacations and
commissions
463,839.92
0
Taxes, other than taxes on income
140,238.72
0
Miscellaneous
17,419.18
0
$ 1,345,737.65
$ 42,321.04
Federal and State taxes on
income - estimated
429,491.60
0
TOTAL CURRENT LIABILITIES
$ 1,775,229.25
$ 42,321.04
STOCKHOLDERS' EQUITY
Common stock - par value $.50 per
share: Authorized - 1,200,000 shares
Issued and outstanding - 370,352 shares
$ 185,176.00
0
Capital stock - par value $100.00 per
share: Authorized - 2,000 shares
Issued and outstanding - 2,000 shares
0
200,000.00
Additional capital
676,987.18
0
$ 862,163.18
$200,000.00
Retained earnings
8,348,363.78
61,900.55
$ 9,210,626.96
$261,900.55
$10,985,856.21
$304,221.59
*66 Petitioner's and International's balance sheets as of December 31, 1960, contained the following: Johnson Bronze
Johnson Bronze
Company
International,
Inc.
CURRENT ASSETS
Cash
$ 370,820.10
$ 25,524.28
Marketable securities - at cost
(approximate market): Obligations of the United States
Government and Agencies
$ 902,989.01
$ 0
Municipal securities
204,781.63
0
$ 1,107,770.64
$ 0
Receivables: Trade
$ 2,002,418.21
$225,681.77
Less allowance for losses in collection
21,500.00
8,000.00
$ 1,980,918.21
$217,681.77
Wholly owned subsidiary
20,655.38
0
$ 2,001,573.59
$217,681.77
Inventories: Finished products
$ 1,367,040.96
$ 20,082.90 *
Work in process
472,615.31
0
Raw materials
768,267.14
0
Manufacturing supplies
112,713.44
0
$ 2,720,636.85
$ 20,082.90
Prepaid insurance and other expenses
73,302.60
0
TOTAL CURRENT ASSETS
$ 6,274,103.78
$263,288.95
INVESTMENTS AND OTHER, ASSETS
Investment in wholly owned subsidiary
$ 200,000.00
$ 0
Investment in Johnson Bronze Company
of Brazil - a partnership
0
169,219.86
Capital stock of other company - at cost
(quoted market price $183,007.34)
20,000.00
0
Miscellaneous receivables, advances,
deposits, etc.
104,904.16
1,500.00
$ 324,904.16
$170,719.86
PROPERTY, PLANT AND EQUIPMENT
- at cost, less allowances for
depreciation and amortization
Land
$ 175,723.42
$ 0
Buildings, machinery and equipment
6,838,906.26
0
Less allowances for depreciation
and amortization
3,434,922.25
0
$ 3,403,984.01
$ 0
Facilities subject to amortization under
provisions of Revenue Act of 1950: Buildings, machinery and
equipment
$ 417,938.71
$ 0
Less allowance for amortization
417,938.71
0
$ 0
0
$ 3,579,707.43
$ 0
PATENTS - at cost, less amortization
$ 192.51
$ 0
ORGANIZATION EXPENSE - at cost,
less amortization
0
292.00
$10,178,907.88
$434,300.81
CURRENT LIABILITIES
Accounts payable and accrued expenses: Trade accounts
$ 480,863.07
$ 6,160.35
Johnson Bronze Company
0
20,655.38
Salaries, wages, vacations
and commissions
441,607.78
0
Taxes, other than taxes on income
121,980.36
0
Miscellaneous
15,289.97
0
$ 1,059,741.18
$ 26,815.73
Federal and States taxes on
income - estimated
24,968.35
0
TOTAL CURRENT LIABILITIES
$ 1,084,709.53
$ 26,815.73
STOCKHOLDERS' EQUITY
Common stock - par value $.50 per share: Authorized - 1,200,000 shares
Issued and outstanding - 370,352 shares
$ 185,176.00
$ 0
Capital stock - par value $100.00 per share: Authorized - 2,000 shares
Issued and outstanding - 2,000 shares
0
200,000.00
Additional capital
$ 676,987.18
0
$ 862,163.18
$200,000.00
Retained earnings
8,232,035.17
207,485.08
$ 9,094,198.35
$407,485.08
$10,178,907.88
$434,300.81
*67 International's retained earnings of $207,485.08 on December 31, 1960 (18 months after International's incorporation), represent 104 percent of the $200,000 invested by petitioner. Petitioner did not receive a dividend from International in 1959 or 1960. The following schedule is a price list of some of the automobile bearings and bushings manufactured and sold by petitioner including some of its highest-volume items. The schedule indicates the price to International, the lowest overseas price, the price to production engine rebuilders (various firms utilizing petitioner's manufactured products in rebuilding engines), the warehouse distributor price, and the price to the Allan Export Company (an American export company which purchased products in the manner described above). Connecting rod bearings and main bearing sets constitute approximately 56 percent, purchased bearings approximately 3 percent, and piston pin bushings and miscellaneous bushings approximately 7 percent of the sales attributed to International. Production
Price
Lowest
Engine
Warehouse
to Inter-
Overseas
Rebuilders
Distributor
PART NUMBER
national
Price
Price Schedule
Price
Allan
Connecting Rod
Bearings
FB 301 X 10 CA
$1.06
$ 1.23
$ .78
$ 1.16
$1.21
FB 302 X 10 CA
.95
1.23
.78
1.16
1.21
FB 303 X 60 CA
.32
.72
.45
.72
DE 30 X 20 SB
.21
.42
.21
.41
.43
CB 590 X 10 SB
.28
.44
.32
.41
.43
FD 675 X 30 CP
.43
.48
.33
.46
.49
Main Bearing Sets
Set 41 X 20
1.71
2.48
1.68
2.38
2.48
Set 12 X 30
2.09
3.32
2.34
3.18
3.31
Set 507 X 30
3.11
4.39
3.60
4.23
4.41
Set 16 X 20
1.67
2.48
1.68
2.38
2.48
Set 39 X 10
2.67
3.08
2.54
2.90
3.02
Purchased Bearings
Set 577 Standard
1.88
1.38
1.33
Set 577 X 10
2.10
1.48
1.43
Set 4004 X Standard
2.52
2.28
2.19
Set 4004 X 20
2.86
2.73
2.63
Set 4018 X Standard
2.16
1.98
2.43
1.90
Piston Pin Bushings
WB 3038 LMS
.04
43.00/M
45.00/M
45.00/M
WB 3065 LMS
.11
83.00/M
92.00/M
92.00/M
WB 1824 LMS
.07
38.30/M
43.00/M
43.00/M
WB 3037 LMS
.03
43.00/M
54.00/M
54.00/M
Miscellaneous Bushings
KB 10612 S
.07
64.00/M
LB 525
.06
47.00/M
LB 528
.08
46.50/M
LPH 200
.07
54.60/M
.06
5006
.06
47.00/M
*68 Although prior to 1959 no major claims had been brought against petitioner, in 1960 the Collector of Internal Revenue of Heilbronn, West Germany, attempted to collect a turnover tax from petitioner with respect to a 1957 sale to German corporation. International also became involved in a dispute in India over a 1962 sale International made to the Eastern Trading Agency. The dispute developed to the point that the Indian Ambassador to the United States and the United States Department of Commerce intervened. International has never filed a United States income tax return. Opinion In support of his determination that the net income of International should be included in the income of petitioner, respondent advances three alternative positions: 1. International was not a viable business entity recognizable for Federal income tax purposes. 2. Even if International is deemed a recognizable separate entity, International is merely a conduit to pass title and acts as petitioner's agent in the receipt of income; therefore, the gross income and deductions attributed to International, in fact and in substance, should be attributed to petitioner under section 61. 3. Respondent's allocation of *69 International's sales to petitioner in the amount of $64,191.86 in 1959 and $152,168.53 in 1960, pursuant to the provisions of section 482, is not a clear abuse of discretion. We will discuss each of these points. 1. Does International constitute a viable business entity for Federal income tax purposes? To be afforded recognition for Federal tax purposes, a corporation must be a viable business entity; that is, it must have been formed for a substantial business purpose or have been actually engaged in some substantive business activity other than avoidance of taxation. Aldon Homes, Inc., 33 T.C. 582, 596 (1959). The converse is, of course, also true; if a corporation is formed to serve a business purpose or is actually conducting business, it must be recognized as a separate entity. Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943); and V. H. Monette and Co., Inc., 45 T.C. No. 2 (October 11, 1965). It is respondent's first contention that International did not, in the years 1959 and 1960, constitute a viable entity for Federal income tax purposes because petitioner did not have a bona fide business purpose in creating International and International did not actually *70 engage in substantial business activities. Petitioner, on the other hand, contends that it was motivated by substantial bona fide business purposes and further that International did in fact actively carry on its own business as an entity separate from petitioner. We agree with petitioner. Petitioner's primary intention in forming International was to insulate itself from liabilities that might be incurred while entering into various business transactions in foreign countries, thereby limiting its losses to the assets in the subsidiary. [2]
For many years prior to the formation of International, petitioner had been urged by industrialists in other countries to enter into business in those countries beyond the foreign selling operations petitioner was then conducting. Petitioner declined to *71 do so for various reasons set forth in our findings of fact. Specifically, there was concern about such dangers as expropriation, economic instability and inflation, potential tort or contract liability, foreign taxes, liabilities arising out of joint operations with foreign taxes, liabilities arising out of joint operations with foreign partners and other dangers which they felt would be present but which were not specifically foreseeable. In light of the history of expropriations and economic instability in various nations in which petitioner desired to operate, these fears have proven to be not wholly imaginary or illusory. This is borne out by the dispute with an Indian customer over a shipment made by International and the attempt by the Heilbronn West German Government to collect a turnover tax. Also, the officers and directors were aware that foreign sales, so important to petitioner, had fallen off drastically. (Brazilian sales fell from $231,000 in 1957 to $36,000 in 1958). They were warned by advisors that foreign sales could not successfully be maintained, let alone expanded, if petitioner continued to conduct its foreign sales in the manner it had in the past. Foreign corporations *72 were beginning to compete for the foreign market at prices which United States manufacturers could not profitably meet because of higher overhead and certain restrictions on imports imposed by various countries. In 1958 representatives of Sinterosa approached petitioner proposing that petitioner become a partner and use its funds and know-how in the direct manufacture and sale of bearings and bushings in Brazil. Petitioner sent its vice president in charge of operations to Brazil for the purpose of investigating this possibility. However, on the basis of his report and a very discouraging report from Price Waterhouse, Peat & Co., concerning Sinterosa's financial condition, petitioner reluctantly decided not to become involved with Sinterosa. Shortly thereafter, Walter Biberschik, one of the minority partners of Sinterosa persuaded petitioner's directors that partnership with Sinterosa was essential if petitioner wanted to retain any part of the Brazilian market. It was then decided to form International to enter into partnership with Sinterosa so that Johnson Bronze would be insulated from the risks of foreign operations. While we are certain that petitioner's directors and officers *73 did consider the tax consequences resulting from the formation of a subsidiary, the evidence is convincing that "insulation" was the primary reason for the incorporation. We further hold that International did actually function so as to fulfill the intended business purpose of insulation; that, by becoming a partner with Sinterosa in Johnson Bronze do Brazil, petitioner's liability was limited to the assets of International. Whether or not the risks sought to be avoided were actually present and whether or not the method adopted would successfully avoid the risks were not important. The important fact is that the parties were concerned about these risks and took steps to avoid them. Polak's Frutal Works, Inc., 21 T.C. 953, 973 (1954). We are unimpressed by respondent's reference to the fact that International, by retaining its 1959 and 1960 earnings instead of distributing them, did not minimize the amount risked. This decision was within management's discretion and does not alter the fact that petitioner's assets, worth 20 times International's assets, were not exposed to liability. Respondent also offers as proof that International was not a separate entity the fact that many *74 of petitioner's customers were turned over to International while petitioner made every effort to convey to its customers the idea that they were still dealing with petitioner. This, as well as respondent's other arguments based on the close working relationship of petitioner and International, does not detract from the fact that International was intended to, and in fact did, serve the bona fide purpose of insulating petitioner from the various risks of foreign operation. It was said in National Carbide Corporation v. Commissioner, 336 U.S. 422 (1949): [A] corporation formed or operated for business purposes must share the tax burden despite substantial identity, in practical operation with its owner. * * *
[When] a corporation carries on business activity the fact that the owner retains direction of its affairs down to the minutest detail, provides all of its assets and takes all of its profits can make no difference tax-wise. 2. Do the income and deductions attributed to International in fact belong to petitioner? Having concluded that International is entitled to recognition as a separate entity, we now turn to the specific activities conducted in the name of International which *75 respondent contends were, in fact and substance, those of petitioner. The transactions so questioned are sales purportedly made by International to foreign customers, most of which were comprised of articles manufactured by petitioner. However, a few of the sales consisted of articles manufactured by the Muskegon Corporation and the Effingham Regrinding Company. We are primarily concerned with the transactions involving the sale of petitioner's products since they composed over 90 percent of International's sales. Sales of other manufacturers' products will be discussed later. It is respondent's contention that International was in no position to render any service, supply any asset or serve any other business function; that petitioner, by denominating certain sales as those of International, was merely syphoning off income which would thereby escape Federal taxation. Petitioner argues that International did in fact conduct extensive business activities insofar as these transactions are concerned, and therefore the sales should not be attributed to petitioner. We agree with petitioner. Generally, if a taxpayer actually carries on business in the form chosen, the tax collector may *76 not deprive him of the incidental tax benefits flowing therefrom unless it first is found to be a fiction or a sham. Polak's Frutal Works, Inc., supra.Therefore, petitioner is entitled to conduct his business in whatever manner he desires without having to maximize revenue for the Government. Unless the transactions attributed to International are determined to be shams, they are not to be disregarded. Sanford H. Hartman, 43 T.C. 105 (1964). We find that International performed enough services with respect to the attributed sales that it cannot be considered a mere sham. Orders that were handled by International would come into the office addressed either to petitioner or International. Petitioner and International shared the same office and as a result their mail was quite often combined, although there were attempts to keep it straight by designating each one's address by a different number. Once the orders were received, they were acknowledged by petitioner or International, depending upon which would service the order, not necessarily upon to whom the order was addressed. The acknowledgments were sent on forms bearing the name of petitioner or International, except during *77 the transitional period when International used some of petitioner's forms with "International" stamped or typed thereon to indicate that acceptance of the order was by International. International's acknowledgments of orders contained a statement to the effect that the customer's order was accepted in accordance with terms and conditions stated on the reverse side and quoted in our findings of fact. One of such terms was a provision to the effect that title to the products sold remained in International until they reached the country of destination. This title rider was not used by petitioner. We are satisfied that, even if the customer sent his original order to petitioner, the acknowledgment and the acceptance on International's forms, along with International's unique conditions of acceptance, put the customer on sufficient notice that International, and not petitioner, was the corporation with whom the customer had contracted. International did not maintain an inventory of petitioner's products but would fill its sales orders by purchasing the needed items from petitioner. International did maintain an inventory of Muskegon and Effingham products and stored them in petitioner's *78 warehouse. Petitioner received 5 percent of the purchase price paid by International for the product. The prices charged by petitioner to International for items manufactured by petitioner and the storage charge for items International bought from other manufacturers will be discussed later. International would usually pay for the items bought within one month, although the average time for payment by its customers was 6 months. International took title which included all risks of ownership to the purchased products. It would then make arrangements for shipment of the products sold with various freight carriers. International carried its own insurance on products in transit, payable to International or one of its agents. International retained title until the products arrived at the port of destination. The customers at this time would be liable for the cost of the goods, insurance, and freight. As title passed to the customer, the risk of the customer's bad credit remained on International. This risk has been shown by International in its monthly statements to be vry real. International kept its own books, the accuracy of which has not been questioned by respondent, and maintained *79 its own bank accounts in Argentina, New York, and, in subsequent taxable years, in Japan. International paid commissions on sales to various agents some of which were under exclusive agency contracts to petitioner. Dubars handled some shipping and collection for International, and would deposit all collections into International's account at Chase Manhattan Bank in New York City. In view of the functions that International served, such as insulating petitioner from potential liability on the contracts of sale with foreign customers, arranging shipment and insurance, and bearing the burden of the risk of loss and credit, we find that International was not merely a conduit to pass title. We further find that, with few exceptions, the sales credited to International should not be disregarded or attributed to petitioner. However, the sales that had been accepted by petitioner in its name, before International came into existence, and were later put on International's books in reality belong to petitioner and International should not be entitled to the profits therefrom. Respondent contends that there was no business purpose beyond tax avoidance for petitioner turning over the sales to *80 International. We believe that as long as International did actually serve the business functions enumerated above, petitioner's motives need not be heavily laden with business purposes or devoid of tax considerations. Respondent contends that since International did not have any warehouse facilities, employees, goodwill, or know-how, it lacked the wherewithal to transact the sales. We know of no requirement indicating that International must possess its own facilities, employees, and know-how. Rather, we think it sufficient that petitioner supplied these things and was compensated for them either by specific allocations or by the price paid petitioner by International for the products. Frank v. International Canadian Corporation, 308 F. 2d 520 (C.A. 9, 1962). Respondent contends that International sold to the same customers to whom petitioner had sold prior to International's incorporation. The fact that International took over some of petitioner's customers does not mean that the sales should be attributed to petitioner. See Polak's Frutal Works, Inc., supra, and Frank, supra.Moreover, International has greatly expanded the list of customers petitioner turned over to it. Respondent *81 contends that petitioner maintained no inventory of petitioner's items, but only purchased what it sold. We believe that it is not essential for International to keep an inventory, but that this should be a factor in determining the price petitioner charges International for its products. Respondent contends that what sales would be in petitioner's name or in International's name was in petitioner's sole discretion, and, further, that petitioner could have refused at any time to sell any of its products to International. While it may be true that petitioner could decide who would earn the income, the fact remains that International did earn the income from its sales. We do not deem the fact that a parent or other stockholder could, if it so desired, prevent a subsidiary from functioning by cutting off its supplies or forcing a cessation of its operations a sufficient reason to pierce the corporate veil. Our only concern is that International was in fact serving the functions described and not that petitioner could have caused International to cease functioning. Respondent contends the fact that petitioner deliberately sold to automobile manufacturers at losses in order to obtain the *82 profitable replacement business should prevent International from reaping the benefit of profits on replacement parts. We believe that petitioner's short term sacrifice is in the nature of goodwill, and as such should not prevent International from contracting for sales in its own name. Rather, this should be considered when determining what price petitioner should have charged International for products manufactured by petitioner. Insofar as International's sales of Muskegon's and Effingham's products are concerned, we believe that the proof is even stronger that they were actually International's sales than in the case of sales of petitioner's products, and that, like International's sales of petitioner's products, these sales were correctly attributed to International. 3. Is respondent's allocation of $64,191.86 in 1959 and $152,168.53 in 1960 pursuant to the provision of section 482 a clear abuse of discretion? Having decided that International is a separate entity, and that most of the sales attributed to International were in fact taxable to it, we now turn to the intercorporate transactions between petitioner and International. Respondent has determined that 100 percent of *83 International's income from its sales of 1959 and 1960 should be included in petitioner's income. As statutory authority for his action, respondent relies upon section 482 which provides that in any case of two or more organizations (whether or not incorporated or whether or not organized in the United States) owned or controlled directly or indirectly by the same interests, the secretary or his delegate may allocate gross income, deductions, credits, or allowances to any such organizations, if he determined that such allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of such organizations. One of the principal reasons for the enactment of section 482 and its predecessors was to prevent the avoidance of taxes by shifting income from a domestic business to a foreign corporation controlled by the same interests. Asiatic Petroleum Co. (Del.) Ltd. 31 B.T.A. 1152 (1935), affd. 79 F. 2d 234 (C.A. 2, 1935); Jesse E. Hall, Sr., 32 T.C. 390 (1959). There can be little doubt that one of the reasons for having International handle the questioned sales was to avoid payment of United States income taxes, and we are satisfied that respondent is justified *84 in invoking section 482 with respect to those profits to which petitioner was entitled. It has been held that respondent is not limited to allocation of gross income, but may allocate net income as a logical short-cut to allocating gross income and deductions. Ballentine Motor Co., 39 T.C. 348 (1962), affd. 321 F. 2d 796 (C.A. 4, 1963), and Hamburgers York Road, Inc., 41 T.C. 821 (1964). The decided cases make it clear that respondent has broad discretion in applying section 482 and that, in the absence of proof that he abused his discretion, respondent's determination should be sustained. See Hamburgers York Road, Inc., supra. In order to prove respondent has abused his discretion petitioner must establish that respondent's determination is arbitrary, capricious, and unreasonable. Grenada Industries, Inc., 17 T.C. 231, 255 (1951). We think petitioner has proven that a 100 percent allocation of sales to petitioner is arbitrary and unreasonable in light of the fact that International actually was a viable business entity and served sufficient business functions insofar as the sales are concerned. Therefore, we must modify respondent's determination. It is apparent that the section 482 *85 requisite of direct or indirect common ownership is present in the case of a parent and subsidiary. However, common ownership does not prohibit all transactions between the two controlled corporations, per se, for as we stated in Ballentine Motor Co., Inc., supra, at p. 357, "taxpayers owned or controlled by the same interests may enter into transactions inter se and, if fair, or resulting from arm's length bargaining, such transactions will be undisturbed." See also Hamburgers York Road, Inc., supra. Consequently, the standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.[3] See 1.482-1(b)(1), Income Tax Regs. An uncontrolled corporation dealing at arm's length with petitioner would not have, without being compensated, performed the business services that International performed. On the other hand, had petitioner been dealing at arm's length with an unrelated corporation, we believe that, because petitioner performed services above and beyond the mere manufacture of goods, it would have demanded a fixed fee or a share of the profits. The question is what share of the profits, or what price for its goods, *86 would petitioner have demanded and received if it had been dealing with a stranger. Nat Harrison Associates, Inc., 42 T.C. 601, 622 (1964). We hold that the 5 percent of the purchase price of piston rings bought from Muskegon and stored by petitioner was equivalent to an arm's length charge for such warehousing; that International's reimbursement of petitioner's expenses in performing executive and clerical services for International was equivalent to an arm's length charge for such services; that the payments to petitioner of $100 per month for International's use of space and equipment and $10 per month for sundry small supplies were equivalent to what would have been paid if the parties were dealing at arm's length. We now turn to the price that International *87 was being charged by petitioner for goods manufactured by petitioner. The price for the various items sold to International was determined on the basis of detailed accounting studies of petitioner's cost of manufacture, to which was added an amount for the overhead deemed allocable, plus a profit factor which petitioner deemed reasonable, usually 6 percent of the sum of the manufacturing and overhead cost. Respondent contends that utilizing standard costs as the foundation for petitioner's intercompany pricing arrangement is inconsistent with acceptable accounting practices since petitioner failed to give cognizance to potential variances between standard costs and actual costs. Respondent further contends that under the circumstances 6 percent is an unrealistic profit factor. While we do not say that utilization of standard costs as a foundation for intercompany pricing arrangements is prohibited in arriving at arm's length amounts, we do believe that in this case the computations of the standard costs were not made in such a manner as to clearly reflect variations. Such variations have been shown, during the years in question, to have caused the actual price to be consistently greater *88 than the estimated standard costs. We also agree that, in light of the facts, 6 percent (actually the percentage was less than 6 percent because as cost variations increased, the percentage of profit decreased) is not equivalent to an amount that would have been settled upon at arm's length bargaining. Petitioner arrived at 6 percent by taking an average of all its sales in each line rather than just considering the sales to customers that resold in foreign countries. In arriving at what would be an arm's length price, we believe that various factors must be taken into account. It has been shown that foreign sales of petitioner's products were more profitable per item sold than domestic sales. International did receive the benefits of petitioner's goodwill which it had built up over years, as well as petitioner's trademarks and patents and general know-how. International was allowed to buy item by item, thereby availing itself of petitioner's warehouse facilities until sales were completed and avoiding the need of financing large inventories that might be difficult to dispose of. Petitioner sold many items at a loss to original manufactures in order to increase the demand and retail *89 market for its replacement parts. International reaped the benefit. [4]
When all these factors are taken into account, there is no justification for International's profits being so large when compared to petitioner's on goods manufactured by petitioner and sold by International. For the year 1960, it was estimated at trial that petitioner received a $19,000 profit while International enjoyed a $145,000 profit on products manufactured by petitioner and sold by International. Hence we think that International should not be charged any less for what they buy from petitioner than other purchasers of petitioner's products similarly situated. We believe that the unrelated firms that bought from petitioner for resale in foreign countries were similarly situated. The export firms had their own customers, their own warehouse facilities, handled their own bookkeeping and bore all risks *90 of collection. International had its own customers and bore all risks of collection. Moreover, it has been shown that International paid all expenses involved in its bookkeeping and in warehousing what inventory it possessed, which is equivalent to having its own facilities. It has not been shown wherein International differs from the exporters as to why it should be charged a lesser price by petitioner for the products it purchases. Accordingly, we hold that International should have been charged the same price as the export firms. In arriving at what we believe would be prices charged to the export firms, we are faced with a situation where the price that is charged to export firms has been computed by taking petitioner's normal jobber net prices as published in petitioner's price lists and subtracting various discounts and commissions which vary according to the materials sold. Since sufficient evidence is lacking as to the particularities of these various discounts and commissions, we have no choice but to use the average net prices for each product charged to an export company that is typical of petitioner's exporting customers. We find that the evidence has shown that the Allan *91 Export Company fits this description. We therefore hold that the arm's length price on each of the various products sold to International in the years 1959 and 1960 is the average net price paid to the petitioner by the Allan Export Company. We further hold that the arm's length price for petitioner's products that were not sold to the Allan Export Company during the years 1959 and 1960 is the weighted average net price paid to petitioner by all of the other export firms to which petitioner did sell these products in 1959 and 1960. To reflect the agreement of the parties on certain issues and our conclusions reached in this opinion, Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise noted.↩
*. Sales Only to International.↩
*. Petitioner's goods in transit and Muskegon rings.↩
*. Petitioner's goods in transit and Muskegon rings.↩
2. Petitioner contends that other reasons for International's incorporation were the anti-American feelings in various countries ("gringoism") and the desire not to alienate its other customers because of sales to foreign customers at a lower price. We believe the desire for insulation was a sufficient business purpose for forming International; therefore, we shall not discuss these other contentions.↩
3. In Frank v. International Canadian Corporation, 308 F. 2d 520↩ (1962), there was a discussion by the Ninth Circuit Court of Appeals concerning whether intercorporate dealings were required to be "reasonable" or at "arm's length." On this subject we shall only say that, on the facts of this case, the only reasonable price charged by petitioner would be one which would have been arrived at if the parties were at arm's length.
4. We have not discussed payments for services performed by petitioner for International, for which petitioner specifically was compensated, as there is no need to consider these again in arriving at an arm's length price for the products. We have found, supra, that compensation for these services was sufficient.↩